## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | |
|---|---|
| Roselyn Theodore, | **1:21-cv-00178** |
| *Plaintiff* | **Jury Trial Demanded** |
| v. | **Complex Litigation Division** |
| Hess Corporation,  Hess Oil New York Corp, *as successor by merger of* Hess Oil Virgin Islands Corp., Lockheed Martin Corp., Glencore Ltd., and Cosmogony II, Inc., | |
| *Defendants* | |

## SECOND AMENDED COMPLAINT

Plaintiff Roselyn Theodore brings this action for damages under the laws of the United States Virgin Islands, demands a trial by jury, and makes the following allegations based on information, belief, and investigation of counsel, except those allegations that pertain to Plaintiff, which are based on personal knowledge:

### PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff is a citizen and resident of St. Croix, United States Virgin Islands.

2.      Defendant Hess Corp. is a Delaware corporation, having its principal place of business in New York.

3.      Defendant Hess Oil New York Corp. ("HONYC") is a New York Corporation with its principal place of business in New York and on May 22, 2020 became the successor by merger of Hess Oil Virgin Islands Corp. (HOVIC), a prior U.S. Virgin Islands corporation, having its prior principal place of business in New York.

4.      Defendant Lockheed Martin Corp. is a Maryland corporation, having its principle place of business in Maryland. It is subject to the specific personal jurisdiction of this Court. It is the

Second Amended Complaint
*Roselyn Theodore v. Hess Corp., et al.*

successor-in-interest to Martin Marietta Corp., Martin Marietta Aluminum Properties Corp., Martin

Marietta Aluminum Corp., Martin Marietta Alumina Corp., Harvey Aluminum, Inc., and Harvey

Alumina, Inc.

5.      Defendant Glencore Ltd. is a Swiss corporation, having its principle place of business

in New York.

6.      Defendant Cosmogony II, Inc. ("Cosmogony") is the successor-in-interest to General

Engineering Corporation. Cosmogony is a U.S. Virgin Islands company, having its principle place of

business in the U.S. Virgin Islands. General Engineering Corporation merged with and into U&W

Industrial Supply, Inc. ("U&W"), a U.S. Virgin Islands corporation. U&W later changed its name to

Cosmogony. General Engineering Corporation and Cosmogony are hereinafter referred to collectively

as "GEC".

7.      This Court has subject matter jurisdiction pursuant to 4 V.I.C. § 76.

8.      Venue is this District is proper pursuant to 4 V.I.C. § 78 because the conduct

complained of in this Complaint was carried out in substantial part within this judicial division.

## FACTUAL ALLEGATIONS RE: THE PLAINTIFF

9.      Plaintiff is the wife of Cecile Theodore ("Worker").

10.     Cecile Theodore worked at the oil refinery previously-owned by HOVIC on St. Croix,

Virgin Islands (the "Oil Refinery").

11.     Worker worked at the Oil Refinery from 1972 to 1982. During his work at the Oil

Refinery, Worker worked as an electrical worker.

12.     Worker worked at the Alumina Refinery from 1983 to 1985, 1991 to 1995, and 1998

to 2001. During his work at the Alumina Refinery, Worker worked in construction and an electrical

worker.

Second Amended Complaint
*Roselyn Theodore v. Hess Corp., et al.*

13.    In the course of his employment at the Oil Refinery, Worker was exposed to dusts from asbestos containing materials ("ACM"), silica, and catalyst.

14.    In the course of his employment at the Alumina Refinery, Worker was exposed to bauxite ore dusts (and their consituents and waste products), caustic soda, asbestos-containg materials ("ACM"), and alumina dust.

15.    Worker transported these dusts home on his clothes, where they were inhaled by Plaintiff.

16.    Plaintiff suffers from pneumoconiosis, which became evident 6/7/2019.

17.    This disease is evidenced by a chest x-ray (read by a competent NIOSH-certified B-reader) a pulmonary function test (PFT), a physical examination, and a discussion and consideration of Plaintiff's work history, among other things.

18.    Plaintiff's lung disease is characterized by shortness of breath, diminished lung capacity, and other respiratory ailments.

19.    This disease and injury are the direct and proximate result of Plaintiff's repeated exposure to various toxic substances as a result of Worker's work at the Oil Refinery and Alumina Refinery.

20.    Plaintiff's injuries are current and will continue for the rest of her life. She seeks recompense for her pain and suffering; her medical bills and anticipated medical needs in the future; and the diminution in quality and enjoyment of her life.

21.    Plaintiff fears the progression of her respiratory symptoms and reasonably fears that he may develop cancer as a result of persistent exposure to toxic materials and substances.

22.    Plaintiff is also at a medically and statistically significant increased risk of developing lung cancer, mesothelioma, and other cancers.

**FACTUAL ALLEGATIONS RE: THE OIL REFINERY**

23. HOVIC owned and operated an Oil Refinery on St. Croix from 1966 to 1998. The Oil Refinery transformed and refined crude petroleum into various useful products.

24. At all relevant times to this action, the Oil Refinery was owned by HOVIC.

25. At all relevant times, HOVIC was a wholly-owned subsidiary of Hess.

26. Worker worked at the Oil Refinery from from 1972 to 1982.

27. During his work at the Oil Refinery, Worker worked with electrical.

28. The Oil Refinery is a very large complex of units, many of which employ hot processes to transform feedstock into a refined product.

29. These hot processes called for the use of extensive amounts of insulation to keep the boilers, heaters, and pipelines at a very high temperature.

30. A large percentage of the insulation used at the Oil Refinery was asbestos-containing.

31. Many of the units at the Oil Refinery make use of catalyst to crack certain hydrocarbons into desirable components.

32. The catalysts were made of heavy metals like nickel, molybdenum, and cobalt.

33. During routine maintenance and turnaround, employees at the Oil Refinery would frequently handle and inhale spent catalyst.

34. Research has shown that constant exposure to asbestos and catalyst can cause serious medical problems.

35. Oil refiners have long understood the dangers posed by exposure to asbestos and catalyst dusts.

36. The U.S. Federal Government has long regulated the limits of industrial exposure to thes dangerous materials, including asbestos and catalyst.

37. The U.S. Virgin Islands has long regulated emisisons of fugitive particulate matters.

Second Amended Complaint
*Roselyn Theodore v. Hess Corp., et al.*

38.    Industry must take all reasonable steps to guard against the release of asbestos and catalyst dusts through sound engineering.

39.    During the course of his employment at the Oil Refinery, Worker came into contact with and inhaled asbestos- and catalyst-laden dusts well in excess of the government limits as well the scientific consensus standards.

40.    Because engineering may not contain all dusting, persons in industrial settings that could be exposed to excessive dust levels must be given proper and timely warnings, training, and personal protective equipment, including respiratory protection.

41.    Government regulators have also required industrial facilities to conduct air tests to assess the concentration of particulate matter. At all relevant times, the Oil Refinery was not equipped with the appropriate equipment to measure particulate concentration. The limited testing that was conducted was substandard, and the tests failed to accord with industry and scientific best practices.

42.    Hess and HOVIC knew of the Government's exposure limits and their importance to the health of workers in industrial settings.

**FACTUAL ALLEGATIONS VIS-À-VIS THE ALUMINA REFINERY**

43.    An Alumina Refinery operated on St. Croix from the early- to mid-1960s to 2000. The Alumina Refinery refined bauxite ore into alumina (aluminum oxide).

44.    Harvey Aluminum, Inc. built the Alumina Refinery. It leased the Alumina Refinery to its wholly-owned subsidiary, Harvey Alumina, Inc., which ran the refining operations and handled everything except for maintenance activities. Harvey Aluminum owned the appurtenances and equipment at the Alumina Reifinery, which appurtenances and equipment were leased to Harvey Alumina. Harvey Aluminum also entered long-term contracts with mining companies for the purchase of bauxite ore to the Alumina Refinery. It shipped or arranged the shipment of purchased bauxite ore

Second Amended Complaint
*Roselyn Theodore v. Hess Corp., et al.*

to the Aluminum Refinery for refinement. Harvey Aluminum changed its name to Martin Marietta Aluminum, Inc. in approximately 1972.

45.    Martin Marietta Aluminum, Inc. ("M/M Alumina") succeeded to Harvey Aluminum's rights and obligations under the bauxite ore supply agreement(s). Harvey Alumina assigned its leasehold to Martin Marietta Alumina, Inc. ("M/M Alumina"), which assumed the obligations of the lease. As under previous management, M/M Alumina ran the bauxite refining operations, except for maintenance activities which M/M Aluminum handled. Also as under previous ownership, M/M Aluminum purchased bauxite ore, which it delivered to the Aluminum Refinery for refining.

46.    M/M Aluminum sold the Alumina Refinery to Martin Marietta Aluminum Properties, Inc. ("MMAP") in 1985. In turn, MMAP sold the Aluminum Refinery to Virgin Islands Alumina Company ("VIALCO") in 1989.

47.    VIALCO was the wholly-owned subsidiary of Glencore Ltd. at all times relevant to this action. It operated the Alumina Refinery from 1990 to 1995. Prior to operating the Alumina Refinery, VIALCO had not owned or operated any other alumina refinery. From 1990 to 1995, Glencore supplied VIALCO and the Alumina Refinery with bauxite ore.

48.    During the years that the Martin Marietta family of companies and VIALCO owned and/or operated the Alumina Refinery, GEC was contracted to provide construction and maintenance services.

49.    Bauxite is a naturally occurring material comprised of hydrated aluminum oxides and aluminosilicates, iron oxides, titanium dioxide, silica, beryllium, and mixtures of other materials; including, quartz, clay minerals, gibbsite $[Al(OH)]$, boehmite $[ALO(OH)]$, and diaspore $[ALO(OH)]$. Bauxite is the principle ore of alumina $(AL2O3)$.

50.    During the refining process, bauxite ore is, among other activities, crushed and ground, which continuously creates large amounts of dust. In his work at the Alumina Refinery, Plaintiff was

Second Amended Complaint
*Roselyn Theodore v. Hess Corp., et al.*

in constant contact with, and exposed to, this unrefined bauxite dust and its constituents.

51.    Caustic soda is added to the ground ore, some of which becomes airborne. In his work at the Alumina Refinery, Plaintiff was in frequent proximity to and inhaled caustic soda dust.

52.    The refinement process involves many hot processes that require the maintenance of high temperatures. To that end, the Alumina Refinery used ACM to insulate vessels, machinery, and pipe. In his work at the Alumina Refinery, Plaintiff was in frequent proximity to and inhaled ACM.

53.    The finished alumina product is a white/silver powder. The alumina is highly susceptible to becoming airborne because of the prevailing trade winds. In his work at the Alumina Refinery, Plaintiff was in frequent proximity to and inhaled alumina dust.

54.    The refinement process also generates a great deal of toxic industrial waste sometimes called "red mud". The chemical composition may include iron (III) oxide ($Fe_2O_3$), aluminum oxide ($Al_2O_3$), silicon dioxide ($SiO_2$), copper (II) oxide ($CuO$), sodium oxide ($Na_2O$), titanium dioxide ($TiO_2$), potassium oxide ($K_2O$), selenium trioxide ($Se_2O_3$), and vanadium pentoxide ($V_2O_5$), arsenic (As), lead (Pb), mercury (Hg), nickel (Ni), chromium (Cr), cadmium (Cd), as well as radioactive uranium and thorium. When red mud dries, it becomes chalky and airborne. In his work at the Alumina Refinery, Plaintiff was in frequent proximity to and inhaled red mud dust.

55.    Alumina refiners have long understood the dangers posed by exposure to bauxite ore dust, its constituent compenents and waste products (including red mud), caustic soda, ACM, and refined alumina. Research shows that exposure to these elements (or mixtures thereof) in industrial settings can cause serious medical problems, including decreased FEV1, radiographic abnormalities, increased opacities, upper and lower respiratory symptoms (shortness of breath, wheeze, chest tightness, rhinitis), pulmonary fibrosis, mixed dust pneumoconiosis, interstitial fibrosis, fibrotic lesions, parenchymal changes, lung cancer, and aluminosis.

**CAUSES OF ACTION AGAINST HESS CORP.**

Second Amended Complaint
*Roselyn Theodore v. Hess Corp., et al.*

**Count 1 – Negligent Undertaking**

56.     Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

57.     Hess is liable to Plaintiff under Section 324A of the Restatement (Second) of Torts, which articulates a sound rule for the Virgin Islands.

58.     Hess undertook to render services to HOVIC and its contractors at the Oil Refinery.

59.     In particular, Hess oversaw the construction of the St. Croix Refinery in 1965 and operated the Refinery until October 1998. During this period, Hess ran the refinery from New Jersey. Hess created and implemented policies at the refinery. These policies included the refinery's safety policies, which were created by Hess "with the express intent of being not only guidance, but operable" in the refinery. Indeed, the policies issued by Hess to HOVIC demanded compliance. And, Hess regularly scheduled safety audits to determine compliance with safety policies.

60.     Hess should have recognized the services it provided to its subsidiaries were necessary for the protection of Plaintiff, generally or in particular.

61.     Hess failed to exercise reasonable care.

62.     The failure to exercise reasonable care increased the risk of harm to Plaintiff.

63.     Hess undertook to perform a duty owed by HOVIC and/or its contractors to Plaintiff.

64.     Plaintiff suffered harm because HOVIC and/or its contractors relied on Hess to fulfill its undertaking.

65.     Plaintiff suffered harm because she relied on Hess to fulfill its undertaking.

66.     Hess directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to toxic substances, as well as the harm and damages Plaintiff has sustained as a result of her exposure.

**Count 2 – Chattel Known to be Dangerous for Intended Use**

Second Amended Complaint
*Roselyn Theodore v. Hess Corp., et al.*

67.     Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

68.     Hess is liable to Plaintiff under Section 388 of the Restatement (Second) of Torts, which articulates a sound common law rule for the Virgin Islands.

69.     Hess supplied ACM, catalyst, and silica—"Chattels"—to its contractors and their employees at the Oil Refinery..

70.     Hess expected its contractors and their employees (including Worker) to use the Chattels, as well as expected that Plaintiff could be endangered by the probable uses of those chattels

71.     Plaintiff was harmed by the Chattels supplied by Hess to HOVIC and/or its contractors and employees for use at the Oil Refinery.

72.     Hess knew or had reason to know that the Chattels are dangerous or likely to be dangerous to humans.

73.     Hess had no reason to believe that its contractors, Worker, or Plaintiff would realize the dangerous condition posed by the Chattels.

74.     Hess failed to exercise reasonable care to inform HOVIC, its contractors, Worker, or Plaintiff of the dangerousness of the Chattels or the facts which make them dangerous.

75.     Hess directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to the Chattels, as well as the harm and damages Plaintiff has sustained as a result of her exposures.

**Count 3 – Chattel Unlikely to be Made Safe for Use**

76.     Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

77.     Hess is liable to Plaintiff under Section 389 of the Restatement (Second) of Torts, which articulates a sound common law rule for the Virgin Islands.

Second Amended Complaint
*Roselyn Theodore v. Hess Corp., et al.*

78.     Hess supplied ACM, catalyst, and silica—"Chattels"—to its contractors and their employees at the Oil Refinery.

79.     While Hess provided warnings and MSDS sheets to HOVIC and its contractors, those warnings and sheets went unheeded. Hess knew or should have known that its warnings and sheets were not being communicated to the workforce at the Oil Refinery.

80.     Hess knew or should have known that the Chattels were unlikely to be made reasonably safe before being put to the use at the Oil Refinery in the manner expected.

81.     Worker was a foreseeable user of the Chattels, and it was forseeable that Worker would be endangered by the probable use of those Chattels.

82.     Plaintiff was ignorant as to the dangerous character of the Chattels and was not contributorily negligent.

83.     Hess directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to the Chattels, as well as the harm and damages Plaintiff has sustained as a result of this exposures.

## Count 4 – Chattel for Use by Person Known to be Incompetent

84.     Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

85.     Hess is liable to Plaintiff under Section 390 of the Restatement (Second) of Torts, which articulates a sound common law rule for the Virgin Islands.

86.     Hess supplied ACM, catalyst, and silica—"Chattels"—to HOVIC and its contractors and their employees at the Oil Refinery.

87.     Hess knew or had reason to know that HOVIC and/or its contractors and their employees at the Oil Refinery were using the Chattels in a manner that involved an unreasonable risk of physical harm to Plaintiff.

88.    In particular, Hess knew or had reason to know that HOVIC and/or its contractors were incompetent, as they facility lacked an adequate respiratory policy prior to the mid-1990s and ignored OSHA regulations.

89.    Hess should have expected that Plaintiff would be endangered by the use of the Chattels at the Oil Refinery.

90.    Hess directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to the Chattels, as well as the harm and damages Plaintiff has sustained as a result of her exposures.

## Count 5 – Chattel Used to Supplier's Business Purpose

91.    Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

92.    Hess is liable to Plaintiff under Section 392 of the Restatement (Second) of Torts, which articulates a sound common law rule for the Virgin Islands.

93.    The Hess Refinery served Hess's business purpose.

94.    At all relevant times, Hess operated a multinational and vertically-integrated energy portfolio, consisting of on-shore and off-shore exploration and production, transportation, refinement, and marketing/selling finished product.

95.    Hess supplied ACM, catalyst, and silica—"Chattels"—to the Hess Refinery for use.

96.    Those asbestos-containing materials served Hess's business purposes because it facilitated refinement operations.

97.    The Chattels were ultimately supplied to the employees at the Hess Refinery, who used, installed, handled, manipulated, fabricated, removed, and/or disposed of it.

98.    Hess should have expected that Worker (and by extension, Plaintiff) and other employees at the Alumina Refinery would be endangered by the probable use of the Chattels.

99.     Plaintiff sustained physical harm caused by the use of the Chattels.

100.     Hess failed to exercise reasonable care to make the Chattels safe for the use for which it was supplied.

101.     Hess failed to exercise reasonable care to discover the dangerous condition or chacter of the Chattels it supplied.

102.     Hess failed to inform Worker (and by extension, Plaintiff) or the other employees at the Hess Refinery of the discover the dangerous condition or chacter of the Chattels it supplied.

103.     Consequently, Hess directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to the Chattels, as well as the harm and damages Plaintiff sustained as a result of this exposure.

### CAUSES OF ACTION AGAINST HESS OIL NEW YORK CORP.
### (AS SUCCESSOR BY MERGER TO HOVIC)

**Count 6 – Premises Liability**

104.     Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

105.     HOVIC is liable to Plaintiff as a premise in accordance with the rule articulated in *Machado v. Yacht Haven, U.S.V.I., LLC*, 61 V.I. 373 (2014).

106.     HOVIC was a legal possessor of the Oil Refinery from 1966 to 1998, and it was a possessor during Worker's working years at the Oil Refinery.

107.     HOVIC had knowledge of the harmful nature of, and danger posed by ACM, silica, and catalyst at all times while Worker was on the Oil Refinery premises.

108.     HOVIC knew that this exposure to ACM, silica, and catalyst posed a foreseeable and unreasonable risk of harm to Worker, Plaintiff, and others.

Second Amended Complaint
*Roselyn Theodore v. Hess Corp., et al.*

109.    HOVIC had a duty to exercise reasonable care including providing Worker with a safe work environment and warning Worker (and by extension, Plaintiff) of any dangers that it could not make safe.

110.    This foreseeable harm could have been prevented if HOVIC had implemented and enforced proper safety measures at the Oil Refinery, and had also warned Worker of the dangers.

111.    HOVIC knew or should have known that Worker (and by extension, Plaintiff) would not discover or realize the danger, as HOVIC was in a superior position of power and knowledge.

112.    HOVIC breached its duty by failing to use reasonable care to protect Plaintiff, by failing to warn Worker or Plaintiff of the dangers, and by failing to provide a safe work environment.

113.    HOVIC's actions and failures to act include:

a.    Failing to adequately monitor the concentration of ACM, silica, and catalyst in the air;

b.    Failing to take appropriate safety precautions regarding to toxic, carcinogenic, hazardous, and/or irritating dusts, fumes, and other substances;

c.    Failing to provide and require the wearing of protective clothing;

d.    Failing to provide effective masks, respirators, and/or fresh air sources;

e.    Failing to provide adequate changing rooms, showers, laundry, and other safety services for exposed workers;

f.    Failing to post warning signs;

g.    Failing to warn Worker or Plaintiff of the health risks associated with exposure to toxic substances, including asbestos, silica, and catalyst;

h.    Failing to timely and appropriately train Worker and his co-workers;

i.    Failing to timely and appropriately engage in medical surveillance of exposed persons, including Worker and Plaintiff;

Second Amended Complaint
*Roselyn Theodore v. Hess Corp., et al.*

j.      Failing to timely and appropriately monitor workforce exposure and health, including that of Worker and Plaintiff.

114.    HOVIC directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to ACM, silica, and catalyst, as well as the harm and damages Plaintiff has sustained as a result of this cumulative exposure.

## CAUSES OF ACTION AGAINST HESS OIL NEW YORK CORP.
### (AS SUCCESSOR BY MERGER TO HOVIC)
### AND
## VIRGIN ISLANDS INDUSTRIAL MAINTENANCE CORP.

### Count 7 – Chattel Known to be Dangerous for Intended Use

115.    Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

116.    HOVIC is  liable to Plaintiff under Section 388 of the Restatement (Second) of Torts, which articulates a sound common law rule for the Virgin Islands.

117.    HOVIC supplied ACM, silica, and catalyst—"Chattels"—to its contractors and their employees at the Oil Refinery.

118.    HOVIC expected its contractors and their employees (including Plaintiff) to use the Chattels, as well as expected that Plaintiff could be endangered by the probable uses of the Chattels

119.    Plaintiff was harmed by the Chattels supplied by HOVIC to the Oil Refinery for use.

120.    HOVIC knew or had reason to know that the Chattels are dangerous or likely to be dangerous to humans.

121.    HOVIC had no reason to believe that its contractors or Plaintiff would realize the dangerous condition posed by the Chattels.

122.    HOVIC failed to exercise reasonable care to inform either its contractors or Plaintiff of the dangerousness of the Chattels or the facts which make them dangerous.

Second Amended Complaint
*Roselyn Theodore v. Hess Corp., et al.*

123.    HOVIC directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to the Chattels, as well as the harm and damages Plaintiff has sustained as a result of her exposures.

**Count 8 – Chattel Unlikely to be Made Safe for Use**

124.    Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

125.    HOVIC are liable to Plaintiff under Section 389 of the Restatement (Second) of Torts, which articulates a sound common law rule for the Virgin Islands.

126.    HOVIC supplied ACM, silica, and catalyst—"Chattels"—to its contractors and their employees at the Oil Refinery for use.

127.    While HOVIC provided warnings and MSDS sheets to its contractors, those warnings and sheets went unheeded. HOVIC knew or should have known that its warnings and sheets were not being communicated to the workforce at the Oil Refinery.

128.    HOVIC knew or should have known that the Chattels were unlikely to be made reasonably safe before being put to the use at the Oil Refinery in the manner expected.

129.    Worker (and by extension, Plaintiff) was a foreseeable user of the Chattels, as well as endangered by the probable use of those Chattels.

130.    Plaintiff was ignorant as to the dangerous character of the Chattels and was not contributorily negligent.

131.    HOVIC directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to the Chattels, as well as the harm and damages Plaintiff has sustained as a result of this exposures.

**Count 9 – Chattel for Use by Person Known to be Incompetent**

Second Amended Complaint
*Roselyn Theodore v. Hess Corp., et al.*

132.    Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

133.    HOVIC are liable to Plaintiff under Section 390 of the Restatement (Second) of Torts, which articulates a sound common law rule for the Virgin Islands.

134.    HOVIC supplied asbestos products and catalyst—"Chattels"—to its contractors and their employees at the Oil Refinery.

135.    HOVIC knew or had reason to know that its contractors and their employees at the Oil Refinery were using the Chattels in a manner that posed an unreasonable risk of physical harm to Plaintiff.

136.    In particular, HOVIC knew or had reason to know that its contractors were incompetent, as they facility lacked an adequate respiratory policy prior to the mid-1990s and ignored OSHA regulations.

137.    HOVIC should have expected that Plaintiff would be endangered by Worker's use of the Chattels at the Oil Refinery.

138.    HOVIC directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to the Chattels, as well as the harm and damages Plaintiff has sustained as a result of her exposures.

**Count 10 – Chattel Used to Supplier's Business Purpose**

139.    Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

140.    HOVIC is liable to Plaintiff under Section 392 of the Restatement (Second) of Torts, which articulates a sound common law rule for the Virgin Islands.

141.    The Oil Refinery served HOVIC's business purpose.

142.    HOVIC supplied ACM, silica, and catalyst—"Chattels"—to the Hess Refinery for use,

Second Amended Complaint
*Roselyn Theodore v. Hess Corp., et al.*

which served HOVIC's business purpose.

143.    The Chattels were ultimately supplied to the employees at the Hess Refinery, who used, installed, handled, manipulated, fabricated, removed, and/or disposed of it.

144.    HOVIC should have expected that Worker (and by extension, Plaintiff) and other employees at the Oil Refinery would be endangered by the probable use of the Chattels.

145.    Plaintiff sustained physical harm caused by the use of the Chattels.

146.    HOVIC failed to exercise reasonable care to make the Chattels safe for the use for which they were supplied.

147.    HOVIC failed to exercise reasonable care to discover the dangerous condition or chacter of the Chattels it supplied.

148.    HOVIC failed to inform Worker (and by extension, Plaintiff) or the other employees at the Hess Refinery of the discover the dangerous condition or chacter of the Chattels it supplied.

149.    Consequently, HOVIC directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to the Chattels, as well as the harm and damages Plaintiff sustained as a result of this exposure.

### CAUSE OF ACTION AGAINST LOCKHEED MARTIN AS SUCCESSOR-IN-INTEREST TO MARTIN MARIETTA CORP.

### Count 11 – Negligent Undertaking

150.    Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein. Lockheed Martin Corp. is liable to Plaintiff under Section 324A of the Restatement (Second) of Torts, which articulates a sound rule for the Virgin Islands, as the successor-in-interest to Martin Marietta Corp. ("M/M Corp.").

151.    The Alumina Refinery's safety department was chronically understaffed. It never had an industrial hygienist on staff, which was crucial to ensure compliance with government regulations and good safety practices, particularly in such a hazardous environment.

152.    In any event, the safety staff at the Alumina Refinery lacked the requisite, education, knowledge, and experience to anticipate, recognize, evaluate, and control the hazards posed by fugitive dusts, including bauxite dust – the key fugitive by-product of the refinement of bauxite ore.

153.    Consequently, the Alumina Refinery's utility was limited. It had the ability to address patent safety deficiencies and acute health issues, such as lacerations and burns. However, the staff lacked the ability to guard against and detect latent health issues, such as lung diseases caused by the chronic inhalation of fugitive dusts.

154.    As a result, the Alumina Refinery counted on M/M Corp. – its parent company – to fill these deficiencies.

155.    M/M Corp. issued its own safety policies, which were much more robust than any policies that were issued and in-effect locally. That's because M/M Corp. had the appropriate staff, with the appropriate expertise, to develop a sufficient safety policy. M/M Corp.'s safety policies, by their own terms, applied to the Alumina Refinery.

156.    M/M Corp. had a robust respiratory policy, but it did not make this policy or any of the accompanying educational materials available to manager on St. Croix. Ultimately, M/M Corp.'s respiratory policies were not followed at the Alumina Refinery.

157.    But this failure went a step further. M/M Corp. misled the staff on St. Croix to believe that bauxite was non-toxic. The Alumina Refinery relied on M/M Corp. to provide hazards information. But the local staff was of the mistaken belief that bauxite was merely a nuisance dust because they lacked the technical expertise to understand that the term "nuisance" did not mean that the dust was inert if inhaled. The local staff relied on M/M Corp. to provide them with MSDS sheets

because they were not available locally on St. Croix. However, even when these sheets were made available, they were ignored, as M/M Corp. told the Alumina Refinery that bauxite ore was safe to breathe in.

158.    Moreover, M/M Corp. directed company presidents, including the presidents M/M Aluminum and M/M Alumina to initiate and conduct formal occupational safety health programs. However, that directive was ignored in St. Croix – whether for budgetary reasons or otherwise – as a formal occupational safety health program was never developed at the Alumina Refinery.

159.    In accordance with M/M Corp.'s policy, M/M Corp. was to receive job safety analyses from M/M Alumina. However, those analyses were never sent to M/M Corp., nor did M/M Corp. follow up with M/M Alumina on why the analyses were not being submitted.

160.    Job safety analyses are critical to establishing a safe sequence of basic job tasks; identifying potential hazards and developing solutions that will eliminate or control personal exposures; as well as critical to training employees on the safety handling of toxic materials, including bauxite ore and its dusts.

161.    M/M Corp. conducted bi-annual plant audits and inspections The audits extended to verifying compliance with M/M Corp. respiratory policy, the vitality of its occupational safety health programs, whether it was conducting job safety analyses, etc. M/M Alumina relied upon M/M Corp.'s audits because it was unable to adequately screen for potential problems with its own resources.

162.    However, M/M Corp. failed to fulfill this audit function, as it failed to recognize that the Alumina Refinery was not assessing the possible damage that airborne bauxite dust and other fugitive dusts were causing to the workforce, but even worse, failing to ensure that the Alumina Refinery corrected these glaring deficiencies. As a result, M/M Corp. couldn't effectively perform its audit role.

163.    These failures to appropriately audit the operations of the Alumina Refinery was a

fundamental failure in light of how the Martin Marietta family of companies were structured. M/M Corp.'s subsidiaries had only the basic knowledge and staffing necessary to complete their immediate tasks. Anything beyond that immediate task was need-to-know, which required the input and assistance of corporate. If corporate did not provide the resources, or to double-check that the subsidiaries were following corporate policies, then the policies were not followed.

164.    These failures manifest in two M/M Corp. surveys of the Alumina Refinery in 1976 and in 1981.

165.    M/M Corp. performed a survey of the St. Croix plant in 1976. The survey revealed airborne silica in excess of safe levels. It concluded that there was a need for ongoing additional air sampling to ensure compliance with safety standards, the need for greater dust control, and the need for surveillance of workers. Despite these obvious warning signs, M/M Corp. neither shut down the Alumina Refinery, nor demanded immediate upgrades, nor ensured that the local staff was immediately educated on how to better protect its workforce.

166.    M/M Corp. later conducted its one and only industrial hygiene survey in 1981 by the corporate family's lone industrial hygienist. The survey recommended a robust sampling program to assess the level of suspended dust particles; that the St. Croix plant conduct pulmonary function testing and respirator fit tests; and that St. Croix develop its own sampling capacity. M/M Corp. knew that these critical safety policies should have been in place for years, and yet still it failed to adequately follow up on and ensure that the Alumina Refinery implemented these recommendations. The Alumina Refinery eventually purchased some air sampling equipment, but that equipment largely went unused.

167.    M/M Corp. undertook to render services to its three subsidiaries at the Alumina Refinery—M/M Aluminum, M/M Alumina, and MMAP (collectively, "M/M Subsidiaries"). It should have recognized the services it provided to its M/M Subsidiaries and/or the Alumina Refinery were

necessary for the protection of Plaintiff, generally or in particular.

168.     M/M Corp. failed to exercise reasonable care. This failure to exercise reasonable care increased the risk of harm to Plaintiff. M/M Corp. undertook to perform a duty owed by one or more M/M Subsidiaries to Plaintiff. The M/M Subsidiaries and/or Plaintiff relied on M/M Corp. to fulfill its undertaking.

169.     Plaintiff was injured as a result of M/M Corp.'s failure to fulfill its undertaking. Consequently, M/M Corp. directly and proximately caused, and is legally responsible and liable for, the harm and damages Plaintiff sustained as a result of his exposure to bauxite ore dusts (and its constituents and waste products), alumina dusts, caustic, and asbestos.

**CAUSES OF ACTION AGAINST LOCKHEED MARTIN,
AS SUCCESSOR-IN-INTEREST TO MARTIN MARIETTA ALUMINUM INC.**

**Count 12 – Premises Liability**

170.     Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein. Lockheed Martin Corp. is liable to Plaintiff as a premise in accordance with the rule articulated in *Machado v. Yacht Haven, U.S.V.I., LLC*, 61 V.I. 373 (2014), as the successor-in-interest to Martin Marietta Aluminum, Inc.

171.     M/M Aluminum was a legal possessor of the Aluminum Refinery from 1968 to 1985, and it was a possessor during Plaintiff's working years at the Aluminum Refinery.

172.     M/M Aluminum had knowledge of the harmful nature of, and danger posed by, bauxite and alumina dusts (and their constituents) at all times while Plaintiff was on the Aluminum Refinery premises. It had a duty to exercise reasonable care including providing Plaintiff with a safe work environment and warning Plaintiff of any dangers that it could not make safe.

173.     M/M Aluminum knew or should have known that these exposures posed a foreseeable and unreasonable risk of harm to Worker, Plaintiff and others. This foreseeable harm could have been

prevented if M/M Aluminum had implemented and enforced proper safety measures at the Aluminum Refinery, and had also warned Worker (and by extension, Plaintiff) of the dangers.

174.    M/M Aluminum knew or should have known that neither Worker nor Plaintiff would not discover or realize the danger, as it was in a superior position of power and knowledge.

175.    M/M Aluminum breached its duty by failing to use reasonable care to protect Worker and Plaintiff, by failing to warn Plaintiff (and by extension, Plaintiff) of the dangers, and by failing to provide a safe work environment.

176.    Martin Marietta Aluminum, Inc.'s actions and failures to act include:

a.    Failing to adequately monitor the concentration of bauxite and alumina dusts, their hazardous constituents, and waste products in the Aluminum Refinery;

b.    Failing to take appropriate safety precautions regarding to toxic, carcinogenic, hazardous, and/or irritating dusts, fumes, and other substances;

c.    Failing to provide and require the wearing of protective clothing; to provide effective masks, respirators, and/or fresh air sources; to provide adequate changing rooms, showers, laundry, and other safety services for exposed workers;

d.    Failing to post warning signs;

e.    Failing to warn Worker (and by extension, Plaintiff) of the health risks associated with bauxite and alumina dust exposures, as well as exposure to as bauxite's hazardous constituents and waste products;

f.    Failing to timely and appropriately train Plaintiff and his co-workers; and

g.    Failing to timely and appropriately engage in medical surveillance of exposed persons, including Plaintiff; to timely and appropriately monitor workforce exposure and health, as well as that of their families, including that of Plaintiff.

177.    The failures of M/M Aluminum were also in violation of the law. At all relevant times, the V.I. government proscribed causing or permitting materials to be handled, used, constructed, altered, repaired, or demolished without taking appropriate precautions to prevent particulate matter from becoming airborne. In particular, the following precautions are required, among others:

        a.    The use, where possible, of water or suitable chemicals for the control of dusts in quarrying operations;

        b.    The application of asphalt, water, or suitable chemicals on dirt roads, materials, stockpiles, and other surfaces that can give rise to airborne dust; and

        c.    The installation and use of hoods, fans, and fabric filters to enclose and vent the handling of dusty materials.

178.    M/M Aluminum's failures to abide by Virgin Islands law constitutes negligence *per se*. Workers at the Alumina Refinery, like Plaintiff, fall within the ambit of these legal protections, as it is precisely those that are injured as a result of operations on the premise that would be most likely to be affected by the failure to abide.

179.    Further, M/M Aluminum leased the Alumina Refinery to M/M Alumina. When it executed the lease, the Alumina Refinery was in a condition of disrepair. The Aluminum Refinery was in disrepair because it was outfitted with old and/or inadequate machinery, dust control devices, and tools that did not comport with developments in technology and industry.

180.    In the lease agreement, M/M Aluminum agreed to keep the Alumina Refinery in repair. The disrepair of the Alumina Refinery created an unreasonable risk to workers, which the performance of M/M Aluminum's agreement would have prevented. M/M Aluminum failed to exercise reasonable care in performing its obligation to keep the Alumina Refinery in a state of repair.

181.    The Aluminum Refinery is dirty by design. Extracting alumina (aluminum oxide) from raw bauxite ore generates an large and continuous amounts of respirable dust from moving it with

heavy machinery, shoveling it, crushing it, etc. Mud tailings are dried in ponds, and during the dry season, this mud becomes dirt, and once again the workforce is exposed to respirable bauxite dusts and alumina dusts, including their constituents and waste products.

182.    M/M Aluminum knew, or by the exercise or reasonable care could have discovered, that this condition of the Alumina Refinery involved an unreasonable risk of harm to the workforce on the premises and members of their families. It had reason to suspect that M/M Alumina would not correct the condition before admitting the workforce to the Alumina Refinery. And it failed to exercise reasonable care to discover or to remedy the condition or otherwise to protect the workforce and their families against the condition.

183.    M/M Aluminum directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to bauxite dust (and its constituents), caustic fume, asbestos, and alumina, as well as the harm and damages Plaintiff has sustained as a result of this exposure.

**Count 13 – Chattel Known to be Dangerous for Intended Use**

184.    Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein. Lockheed Martin is liable to Plaintiff under Section 388 of the Restatement (Second) of Torts, which articulates a sound common law rule for the Virgin Islands, as the successor-in-interest to M/M Aluminum.

**Count 3(a) – Bauxite as Chattel**

185.    Prior to 1986, M/M Aluminum supplied bauxite ore—a chattel—to the Aluminum Refinery for use.

186.    M/M Aluminum should have expected the Aluminum Refinery and Worker to use the bauxite ore, as well as expect that Plaintiff could be endangered by the probable uses of bauxite ore—namely, refinement. It knew or had reason to know that bauxite ore is dangerous or likely to be dangerous during the refinement process. It had no reason to believe that the Aluminum Refinery or

Second Amended Complaint
*Roselyn Theodore v. Hess Corp., et al.*

Plaintiff would realize the dangerous condition of bauxite ore.

187.    M/M Aluminum failed to exercise reasonable care to inform either the Aluminum Refinery or Plaintiff of the dangerousness of bauxite ore or the facts which make bauxite ore likely to be dangerous.

188.    Plaintiff was harmed as a result of M/M Aluminum's failures. M/M Aluminum directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to bauxite dusts and its constituents, as well as the harm and damages Plaintiff has sustained.

## Count 3(b) – Refinery Machinery & Equipment as Chattel

189.    Prior to 1986, M/M Aluminum leased refining machinery, appurtenances, and equipment—chattels—to M/M Alumina for use at the Aluminum Refinery.

190.    The Alumina Refinery is outfitted with machinery and equipment designed to move and pulverize bauxite ore. This machinery and equipment includes conveyor belts, chutes, ball grinders, digestors, etc. During refinement operations, these machines and equipment create and spread large amounts of bauxite ore dusts and its constituents. Consequently, the workforce at the Alumina Refinery is invariably exposed to and inhales bauxite ore dusts and its constituents.

191.    M/M Aluminum should have expected the Aluminum Refinery and Worker to use the refinery machinery and equipment, as well as expect that Plaintiff could be endangered by the probable uses that machinery and equipment—namely, moving and pulverizing bauxite ore. Plaintiff was harmed by the bauxite ore supplied by M/M Aluminum to the Aluminum Refinery.

192.    M/M Aluminum knew or had reason to know that refinement machinery and equipment was dangerous or likely to be dangerous during the refinement process. It had no reason to believe that M/M Alumina or Plaintiff would realize the dangerous condition of the refinement machinery and equipment. And it failed to exercise reasonable care to inform either M/M Alumina or Plaintiff of the dangerousness of refinement machinery and equipment or the facts which make

Second Amended Complaint
*Roselyn Theodore v. Hess Corp., et al.*

refinement machinery and equipment likely to be dangerous.

193.    Consequently, M/M Aluminum directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to bauxite dusts and its constituents, as well as the harm and damages Plaintiff has sustained as a result of this exposure.

## Count 3(c) – Heavy Equipment as Chattel

194.    Prior to 1986, M/M Aluminum leased heavy machinery—chattels—to M/M Alumina for use at the Aluminum Refinery. Workers at the Alumina Refinery used bulldozers, backhoes, cranes, dump trucks, and other large machinery to unload bauxite ore from vessels, position the raw bauxite ore in the storage shed, load raw bauxite ore onto conveyers, and to cleanup excess materials.

195.    The use of heavy equipment at the Alumina Refinery created and spread large amounts of bauxite dusts and its constituents. Consequently, the workforce at the Alumina Refinery is invariably exposed to and inhales bauxite ore dusts and its constituents.

196.    Plaintiff was harmed by the heavy equipment supplied by M/M Aluminum to the Aluminum Refinery because she frequently inhaled bauxite ore dust kicked-up by the heavy machinery.

197.    M/M Aluminum should have expected the Aluminum Refinery and Worker to use the heavy equipment, as well as expect that Plaintiff could be endangered by the probable uses that heavy equipment —namely, moving bauxite ore. It knew or had reason to know that heavy equipment was dangerous or likely to be dangerous during the refinement process. It had no reason to believe that the M/M Alumina, Worker, or Plaintiff would realize the dangerous condition of the heavy equipment. And it failed to exercise reasonable care to inform M/M Alumina, Worker, or Plaintiff of the dangerousness of heavy equipment or the facts which made heavy equipment likely to be dangerous.

198.    Consequently, M/M Alumina directly and proximately caused, and is legally

responsible and liable for, Plaintiff's exposure to bauxite dusts and its constituents, as well as the harm and damages Plaintiff has sustained as a result of this exposure.

**Count 14 – Chattel Unlikely to be Made Safe for Use**

199.    Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein. Lockheed Martin is liable to Plaintiff under Section 389 of the Restatement (Second) of Torts, which articulates a sound common law rule for the Virgin Islands, as the successor-in-interest to M/M Aluminum.

**Count 4(a) – Bauxite as Chattel**

200.    M/M Aluminum supplied bauxite ore—a chattel—to the Aluminum Refinery for use.

201.    While M/M Aluminum provided warnings and/or MSDS sheets to the operator(s) of Aluminum Refinery, those warnings and MSDS sheets went unheeded. M/M Aluminum knew or should have known that its warnings and/or MSDS sheets were not being communicated to the workforce at the Aluminum Refinery. M/M Aluminum knew or should have known that the bauxite ore was unlikely to be made reasonably safe before being put to the use in the manner expected—namely, refinement into alumina.

202.    Worker was a foreseeable user of the chattel, and it was foreseeable that Plaintiff would be injured by the probable use of the chattel. Plaintiff was ignorant as to the dangerous character of bauxite ore and was not contributorily negligent.

203.    M/M Aluminum directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to bauxite dusts and its constituents, as well as the harm and damages Plaintiff sustained as a result of this exposure.

**Count 4(b) – Refinery Appurtenances as Chattel**

204.    M/M Aluminum leased refining machinery, appurtenances, and equipment—chattels—to M/M Alumina for use at the Aluminum Refinery. The Alumina Refinery is outfitted with

machinery and equipment designed to move and pulverize bauxite ore. This machinery and equipment includes conveyor belts, chutes, ball grinders, digestors, etc.

205.    M/M Aluminum knew or should have known that the machines and equipment were unlikely to be made reasonably safe before being put to the use in the manner expected—namely, used in the processing of bauxite ore into alumina (aluminum oxide).

206.    During refinement operations, these machines and equipment create and spread large amounts of bauxite ore dusts and its constituents. Consequently, the workforce at the Alumina Refinery was invariably exposed to and inhales bauxite ore dusts and its constituents.

207.    Plaintiff was a foreseeable user of the chattels, as well as endangered by the probable use of the chattels. He was ignorant as to the dangerous character of the machines and equipment was not contributorily negligent.

208.    M/M Aluminum directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to bauxite dusts and its constituents as a result of the dangerous machines and equipment, as well as the harm and damages Plaintiff sustained as a result of this exposure.

**Count 15 – Chattel for Use by Person Known to be Incompetent**

209.    Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein. Lockheed Martin is liable to Plaintiff under Section 390 of the Restatement (Second) of Torts, which articulates a sound common law rule for the Virgin Islands, as the successor-in-interest to M/M Aluminum.

**Count 5(a) – Bauxite as Chattel**

210.    At all relevant times, M/M Aluminum supplied bauxite ore—a chattel—to the Aluminum Refinery for use.

211.    M/M Aluminum knew or had reason to know that the operators of the Aluminum Refinery were using supplied bauxite ore in a manner that involved an unreasonable risk of physical

harm to Plaintiff. In particular, M/M Aluminum knew or had reason to know that the Aluminum Refinery owners and operators were incompetent, as they lacked an adequate respiratory policy and failed to abide applicable government regulations.

212.   M/M Aluminum should have expected that Plaintiff would be endangered by the use of bauxite ore at the Aluminum Refinery.

213.   M/M Aluminum directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to bauxite dusts and its constituents , as well as the harm and damages Plaintiff sustained as a result of this exposure.

### Count 5(b) – Refinery Appurtenances as Chattel

214.   At all relevant times, M/M Aluminum leased refining machinery, appurtenances, and equipment—chattels—to M/M Alumina for use at the Aluminum Refinery.

215.   The Alumina Refinery is outfitted with machinery and equipment designed to move and pulverize bauxite ore. This machinery and equipment includes conveyor belts, chutes, ball grinders, digestors, etc. During refinement operations, these machines and equipment create and spread large amounts of bauxite ore dusts and its constituents. Consequently, the workforce at the Alumina Refinery is invariably exposed to and inhales bauxite ore dusts and its constituents.

216.   M/M Aluminum knew or had reason to know that the operators of the Aluminum Refinery were using supplied refinement machinery and equipment in a manner that involved an unreasonable risk of physical harm to Plaintiff. In particular, M/M Aluminum knew or had reason to know that the Aluminum Refinery owners and operators were incompetent, as they lacked an adequate respiratory policy and failed to abide applicable government regulations.

217.   Martin Marietta Aluminum, Inc. should have expected that Plaintiff would be endangered by the use of supplied refinement machinery and equipment at the Aluminum Refinery.

Second Amended Complaint
*Roselyn Theodore v. Hess Corp., et al.*

218.    Martin Marietta Aluminum, Inc. directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to bauxite dusts and its constituents as a result of it supplying the refinement machinery and equipment, as well as the harm and damages Plaintiff sustained as a result of his exposure to bauxite dust.

## Count 5(c) – Heavy Equipment as Chattel

219.    At all relevant times, M/M Aluminum leased heavy machinery—chattels—to M/M Alumina for use at the Aluminum Refinery. Workers at the Alumina Refinery used bulldozers, backhoes, cranes, dump trucks, and other large machinery to unload bauxite ore from vessels, position the raw bauxite ore in the storage shed, load raw bauxite ore onto conveyers, and to cleanup excess materials.

220.    The use of heavy equipment at the Alumina Refinery created and spread large amounts of bauxite dusts and its constituents. Consequently, the workforce at the Alumina Refinery is invariably exposed to and inhales bauxite ore dusts and its constituents.

221.    M/M Aluminum knew or had reason to know that the owners and operators of the Aluminum Refinery were using supplied heavy equipment in a manner that involved an unreasonable risk of physical harm to Worker, and by extension, Plaintiff. In particular, M/M Aluminum knew or had reason to know that the Aluminum Refinery owners and operators were incompetent, as they lacked an adequate respiratory policy and failed to abide applicable government regulations. Martin Marietta Aluminum, Inc. should have expected that Plaintiff would be endangered by the use of supplied heavy equipment at the Aluminum Refinery.

222.    Martin Marietta Aluminum, Inc. directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to bauxite dusts and its constituents as a result of it supplying the heavy equipment as well as the harm and damages Plaintiff sustained as a result of his exposure to bauxite dusts and its constituents.

**Count 16 – Chattel Used to Supplier's Business Purpose**

223.    Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein. Lockheed Martin is liable to Plaintiff under Section 392 of the Restatement (Second) of Torts, which articulates a sound common law rule for the Virgin Islands, as the successor-in-interest to M/M Aluminum.

224.    The Alumina Refinery served M/M Aluminum's business purpose. M/M Aluminum operated an international, vertically-integrated alumina production operation, which included mining raw ore, shipping raw ore, overseeing refinement, finding purchasers of refined alumina, and shipping raw alumina to purchasers.

**Count 6(a) – Bauxite as Chattel**

225.    Prior to 1985, M/M Aluminum supplied bauxite ore—a chattel—to the Aluminum Refinery for use. The bauxite ore was ultimately supplied to the employees at the Alumina Refinery, who refined the bauxite ore into alumina.

226.    M/M Aluminum should have expected that Plaintiff, other employees at the Alumina Refinery, and their respective families would be endangered by the probable use of the bauxite ore. It failed to exercise reasonable care to make the bauxite ore safe for the use for which it was supplied. It failed to exercise reasonable care to discover the dangerous condition or character of the bauxite ore it supplied. And it  failed to inform Plaintiff or the other employees at the Alumina Refinery of the discover the dangerous condition or character of the bauxite ore it supplied.

227.    Consequently, M/M Aluminum directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to bauxite dusts and its constituents, as well as the harm and damages Plaintiff sustained as a result of this exposure.

**Count 6(b) – Refinery Appurtenances as Chattel**

Second Amended Complaint
*Roselyn Theodore v. Hess Corp., et al.*

228.    At all relevant times, M/M Aluminum leased refining machinery, appurtenances, and equipment—chattels—to M/M Alumina for use at the Aluminum Refinery.

229.    The Alumina Refinery is outfitted with machinery and equipment designed to move and pulverize bauxite ore. This machinery and equipment includes conveyor belts, chutes, ball grinders, digestors, etc. During refinement operations, these machines and equipment create and spread large amounts of bauxite ore dusts and its constituents. Consequently, the workforce at the Alumina Refinery was invariably exposed to and inhales bauxite ore dusts and its constituents.

230.    M/M Aluminum should have expected that Plaintiff, other employees at the Alumina Refinery, and their respective families would be endangered by the probable use of the refining machinery, appurtenances, and equipment. It failed to exercise reasonable care to make the refining machinery, appurtenances, and equipment for the use for which it was supplied. It failed to exercise reasonable care to discover the dangerous condition or character of the refining machinery, appurtenances, and equipment it supplied. And it failed to inform Plaintiff or the other employees at the Alumina Refinery of the discover the dangerous condition or character of the refining machinery, appurtenances, and equipment it supplied.

231.    Consequently, M/M Aluminum directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to bauxite dusts and its constituents, as well as the harm and damages Plaintiff sustained as a result of this exposure.

## Count 6(c) – Heavy Equipment as Chattel

232.    At all relevant times, M/M Aluminum leased heavy machinery—chattels—to M/M Alumina for use at the Aluminum Refinery. Workers at the Alumina Refinery used bulldozers, backhoes, cranes, dump trucks, and other large machinery to unload bauxite ore from vessels, position the raw bauxite ore in the storage shed, load raw bauxite ore onto conveyers, and to cleanup excess materials.

233.    The use of heavy equipment at the Alumina Refinery created and spread large amounts of bauxite dusts and its constituents. Consequently, the workforce at the Alumina Refinery is invariably exposed to and inhales bauxite ore dusts and its constituents.

234.    M/M Aluminum's should have expected that Plaintiff, other employees at the Alumina Refinery, and their respective families would be endangered by the probable use of the heavy equipment. It failed to exercise reasonable care to make the heavy equipment safe for the use for which it was supplied. It failed to exercise reasonable care to discover the dangerous condition or character of the refining heavy equipment it supplied. And it failed to inform Worker or Plaintiff of the discover the dangerous condition or character of the heavy equipment it supplied.

235.    Consequently, M/M Aluminum directly and proximately caused, and is legally responsible and liable for, Plaintiff's exposure to bauxite dusts and its constituents, as well as the harm and damages Plaintiff sustained as a result of this exposure.

**CAUSES OF ACTION AGAINST LOCKHEED MARTIN,
AS SUCCESSOR-IN-INTEREST TO MARTIN MARIETTA ALUMINA, INC.**

**<u>Count 17 – Premises Liability</u>**

236.    Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein.

237.    Lockheed Martin Corp. is liable to Plaintiff as a premise in accordance with the rule articulated in *Machado v. Yacht Haven, U.S.V.I., LLC*, 61 V.I. 373 (2014), as the successor-in-interest to M/M Alumina.

238.    At all relevant times, M/M Alumina was a legal possessor of the Aluminum Refinery.

239.    M/M Alumina had knowledge of the harmful nature of, and danger posed by, bauxite and alumina dusts and its constituents, caustic fumes and materials, and asbestos at all times while Worker was on the Aluminum Refinery premises. It knew that the potential for exposure at the

Second Amended Complaint
*Roselyn Theodore v. Hess Corp., et al.*

Alumina Refinery posed a foreseeable and unreasonable risk of harm to Plaintiff and others.

240.     M/M Alumina had a duty to exercise reasonable care including providing Worker with a safe work environment and warning Worker (and by extension, Plaintiff) of any dangers that it could not make safe.

241.     This foreseeable harm could have been prevented if M/M Alumina had implemented and enforced proper safety measures at the Aluminum Refinery, and had also warned Worker (and by extension, Plaintiff) of the dangers.

242.     M/M Alumina knew or should have known that neither Worker nor Plaintiff would discover or realize the danger, as Martin Marietta Alumina, Inc. was in a superior position of power and knowledge.

243.     M/M Alumina breached its duty by failing to use reasonable care to protect Plaintiff, by failing to warn Worker of the dangers, and by failing to provide Worker a safe work environment.

244.     M/M Alumina's actions and failures to act include:

    a.     Failing to adequately monitor the concentration of bauxite and alumina dusts, caustic fumes and materials, and asbestos, as well as the dusts of its hazardous constituents and waste products, in the Aluminum Refinery;

    b.     Failing to take appropriate safety precautions regarding to toxic, carcinogenic, hazardous, and/or irritating dusts, fumes, and other substances;

    c.     Failing to provide and require the wearing of protective clothing;

    d.     Failing to provide effective masks, respirators, and/or fresh air sources;

    e.     Failing to provide adequate changing rooms, showers, laundry, and other safety services for exposed workers;

    f.     Failing to post warning signs;

g.      Failing to warn Worker (and by extension, Plaintiff) of the health risks associated with bauxite and alumina dusts, caustic fume and materials, and asbestos exposures, as well as exposure to as bauxite's hazardous constituents and waste products;

h.      Failing to timely and appropriately train Worker and his co-workers;

i.      Failing to timely and appropriately engage in medical surveillance of exposed persons, including Worker and Plaintiff;

j.      Failing to timely and appropriately monitor workforce exposure and health, as well as family exposure and health, including that of Plaintiff.

245.    At all relevant times, the government of the Virgin Islands proscribed causing or permitting materials to be handled, used, constructed, altered, repaired, or demolished without taking appropriate precautions to prevent particulate matter from becoming airborne. In particular, the following precautions are required, among others:

a.      The use, where possible, of water or suitable chemicals for the control of dust in quarrying operations;

b.      The application of asphalt, water, or suitable chemicals on dirt roads or roads under construction, materials, stockpiles, and other surfaces that can give rise to airborne dust; and

c.      The installation and use of hoods, fans, and fabric filters to enclose and vent the handling of dusty materials.

246.    M/M Alumina's failures to abide by Virgin Islands law constitutes negligence *per se*. Family members of workers at the Alumina Refinery, like Plaintiff, fall within the ambit of these legal protections, as it is precisely those exposed to materials that leave the premise that would be most likely to be affected by the failure to abide.

247.    Consequently, M/M Alumina directly and proximately caused, and is legally

responsible and liable for, Plaintiff's exposure to bauxite, as well as the harm and damages Plaintiff

sustained as a result of this exposure.

## CAUSES OF ACTION AGAINST GLENCORE LTD.

### Count 18 – Chattel Known to be Dangerous for Intended Use

248.    Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if

fully set forth herein. Glencore is liable to Plaintiff under Section 388 of the Restatement (Second) of

Torts, which articulates a sound common law rule for the Virgin Islands.

249.    Glencore supplied bauxite ore—a chattel—to the Aluminum Refinery for use from

1990 to 1995. It expect the Aluminum Refinery and Plaintiff to use the bauxite ore, as well as expect

that Plaintiff could be endangered by the probable uses of bauxite ore—namely, refinement.

250.    Glencore knew or had reason to know that bauxite ore, bauxite dusts and its

constituents  is dangerous or likely to be dangerous during the refinement process. It had no reason

to believe that the Aluminum Refinery, Worker, or Plaintiff would realize the dangerous condition of

bauxite ore, bauxite dusts and its constituents. And it failed to exercise reasonable care to inform either

the Aluminum Refinery, Worker, or Plaintiff of the dangerousness of bauxite ore, bauxite dusts and

its constituents or the facts which make bauxite ore, bauxite dusts and its constituents likely to be

dangerous.

251.    Plaintiff was harmed by the bauxite ore supplied by Glencore to the Aluminum

Refinery.

252.    Glencore directly and proximately caused, and is legally responsible and liable for,

Plaintiff's exposure to bauxite dusts and its constituents, as well as the harm and damages Plaintiff

sustained as a result of this exposure.

### Count 19 – Chattel Unlikely to be Made Safe for Use

253.    Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein. Glencore is liable to Plaintiff under Section 389 of the Restatement (Second) of Torts, which articulates a sound common law rule for the Virgin Islands.

254.    If Glencore provided warnings and MSDS sheets to the Aluminum Refinery, those warnings and MSDS sheets went unheeded. Glencore knew or should have known that any warnings and sheets it may have provided were not being communicated to the workforce at the Aluminum Refinery.

255.    Glencore knew or should have known that the bauxite ore was unlikely to be made reasonably safe before being put to the use Glencore should expect it to be put—namely, refinement into alumina oxide.

256.    Plaintiff was a foreseeable user of the chattel, as well as endangered by the probable use of the chattel. He was ignorant as to the dangerous character of bauxite ore, its hazardous constituents, and its waste products, and he was not contributorily negligent.

257.    Glencore directly and proximately caused, and is legally responsible and liable for, the harm and damages caused by Plaintiff's exposure to bauxite ore, its hazardous constituents, its waste products, and the refined alumina derived therefrom.

**Count 20 – Chattel for Use by Person Known to be Incompetent**

258.    Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein. Glencore is liable to Plaintiff under Section 390 of the Restatement (Second) of Torts, which articulates a sound common law rule for the Virgin Islands.

259.    Glencore knew or had reason to know that the owners and operators of the Alumina Refinery were using the bauxite ore supplied by Glencore in a manner that involved an unreasonable risk of physical harm to Worker and Plaintiff. It should have expected that Plaintiff would be endangered by the use of bauxite ore at the Alumina Refinery.

260.     In particular, Glencore knew or had reason to know that the Alumina Refinery owners and operators were incompetent. VIALCO had not previously owned or operated an alumina refinery prior to 1990 when it began operations in St. Croix. It failed to implement the necessary engineering controls to minimize worker exposure to bauxite, its constituent components, and waste products. It lacked an adequate respiratory policy to guard against the inhalation of bauxite dust, its constituent components, and waste products. It had a substandard safety department that was understaffed and/or not properly staffed by personnel with the necessary background and experience. It and its management failed to understand and/or was unconcerned with the dangers associated with bauxite dust and its constituents inhalation. It failed to implement and/or implemented substandard air monitoring or testing protocols to measure fugitive and/or bauxite dusts. And it failed to abide applicable OSHA and/or MSHA regulations regarding handling and processing bauxite ore and/or its constituent components and waste products.

261.     Glencore directly and proximately caused, and is legally responsible and liable for, the harm and damages caused by Plaintiff's exposure to bauxite ore, its hazardous constituents, its waste products, and the refined alumina derived therefrom.

**Count 21 – Chattel Used to Supplier's Business Purpose**

262.     Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein. Glencore is liable to Plaintiff under Section 392 of the Restatement (Second) of Torts, which articulates a sound common law rule for the Virgin Islands.

263.     The Alumina Refinery served Glencore's business purpose during the years of VIALCO's ownership and operation. At all relevant times, Glencore operated a multinational and vertically-integrated alumina refinement portfolio, consisting of mining, shipping, refinement, smelting, and marketing/selling. Those bauxite ore served Glencore's business purposes because it was integral part of the start-to-finish operation.

264.    The bauxite ore as ultimately supplied to the Alumina Refinery, where it was crushed, ground, liquified, and disposed of. Glencore should have expected that Worker, other employees at the Alumina Refinery, and their respective families (including Plaintiff) would be endangered by the probable use of the bauxite ore and bauxite dusts, its hazardous constituents, its waste products, and the refined alumina derived therefrom.

265.    Glencore failed to exercise reasonable care to make the bauxite ore safe for the use for which it was supplied. It failed to exercise reasonable care to discover the dangerous condition or character of the bauxite ore.it supplied. And it failed to inform Worker, Plaintiff, or the other employees at the Alumina Refinery of the discover the dangerous condition or character of the bauxite ore it supplied.

266.    Glencore directly and proximately caused, and is legally responsible and liable for, the harm and damages caused by Plaintiff's exposure to bauxite ore, its hazardous constituents, its waste products, and the refined alumina derived therefrom.

## Count 22 – Negligent Undertaking

267.    Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein. Glencore is liable to Plaintiff under Section 324A of the Restatement (Second) of Torts, which articulates a sound rule for the Virgin Islands.

268.    Glencore undertook to render services to its subsidiary VIALCO. It should have recognized the services it provided to VIALCO were necessary for the protection of Plaintiff, generally or in particular.

269.    Glencore failed to exercise reasonable care, which increased the risk of harm to Plaintiff. It undertook to perform a duty owed by VIALCO to Plaintiff.

270.    Plaintiff suffered harm because VIALCO relied on Glencore to fulfill its undertaking. And he suffered harm because he relied on Glencore to fulfill its undertaking.

271.    Glencore directly and proximately caused, and is legally responsible and liable for, the harm and damages caused by Plaintiff's exposure to bauxite ore, its hazardous constituents, its waste products, the refined alumina derived therefrom, caustic fumes, and asbestos.

### CAUSES OF ACTION AGAINST COSMOGONY II, INC. AS SUCCESSOR-IN-INTEREST TO GENERAL ENGINEERING CORP.

### Count 23 – Negligence

272.    Plaintiff hereby realleges and incorporates by reference all previous paragraphs as if fully set forth herein. GEC is liable to Plaintiff as it acted negligently.

273.    GEC's services installing, removing, and replacing ACM, which work resulted in the release of asbestos fibers into the air.

274.    GEC was negligent insofar as it failed to take adequate precautions to guard against and warn of the consequences these releases. Among other things, GEC failed to adequately train its employees on how to recognize and properly dispose of ACM. It failed to adequately warn its employees and those in the vicinity of the dangers of ACM or regarding the use of appropriate PPE.

275.    Further, GEC was negligent in its provision of maintenance work. It failed to adequately maintain the various mechanical components at the Alumina Refinery. In particular, the machinery used to convey and pulverize bauxite ore was constantly in poor working order, and as a result, fugitive bauxite emissions were frequent.

276.    Both instances of negligent presented foreseeable risks of harm—namely, that Plaintiff, his co-workers, and others would come into contact with and inhale an inordinate amount of ACM and bauxite dust.

277.    GEC owed a duty of reasonable care under the circumstances. In this specific case, its duty was to perform its construction and maintenance duties with the due care necessary for a refinery contractor, with the understanding that the materials at the Alumina Refinery were dangerous and

Second Amended Complaint
*Roselyn Theodore v. Hess Corp., et al.*

required special precautions.

278.    However, GEC violated its duty of reasonable care as detailed above.

279.    GEC directly and proximately caused, and is legally responsible and liable for, the harm and damages caused by Plaintiff's exposure to bauxite ore, its hazardous constituents, its waste products, and asbestos.

## NOTICE OF PUNITIVE DAMAGES

280.    Plaintiff seeks punitive damages against Hess and HONYC.

281.    Hess's and HOVIC's respective failures as described herein were intentional and/or done or with a willful or reckless disregard of the the rights of others, including the plaintiff.

282.    An award of punitive damages is warranted to punish the defendants, deter similar conduct by others, encourage others harmed to step forward, and to additionally compensate Plaintiff for the egregious conduct to which he was subjected.

## JURY TRIAL DEMANDED

283.    Plaintiff demands a trial by jury, pursuant to 5 V.I.C. § 358 and Rule 38(b) of the Virgin Islands Rules Civil Procedure, of all issues so triable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests:

a.    After trial by jury, he be awarded full monetary damages afforded by law, including punitive damages;

b.    She be awarded pretrial interest from the date of the initial Complaint through final judgment;

c.    She be awarded her costs; and

d.    The Court grant such additional relief as may be deemed just and proper.

Second Amended Complaint
*Roselyn Theodore v. Hess Corp., et al.*

**DATED:**      April 29, 2021                    Respectfully submitted,



Korey A. Nelson, Esq. (V.I. Bar No. 2012)
C. Jacob Gower, Esq. (V.I. Bar No. 2103)
BURNS CHAREST LLP
365 Canal Street, Suite 1170
New Orleans, LA 70130
Telephone: (504) 799-2845
Facsimile: (504) 881-1765
knelson@burnscharest.com
jgower@burnscharest.com

Warren T. Burns, Esq. (V.I. Bar No. 2004)
Daniel H. Charest, Esq. (V.I. Bar No. 2020)
BURNS CHAREST LLP
900 Jackson Street, Suite 500
Dallas, Texas 75202
Telephone: (469) 904-4550
Facsimile: (469) 444-5002
wburns@burnscharest.com
dcharest@burnscharest.com

J. Russell B. Pate, Esq. (V.I. Bar No. 1124)
THE PATE LAW FIRM
P.O. Box 890
St. Thomas, USVI 00804
Telephone: (340) 777-7283
Facsimile: (888) 889-1132
pate@sunlawvi.com